ELLIS, Judge.
Plaintiff filed this suit on May 10, 1955 individually for medical expenses paid on behalf of his minor daughter, Sandra Kim-ball, and individually on behalf of the minor for damages for personal injuries suffered by the latter while a guest passenger in the back seat of a Buick sedan being driven by the minor daughter of the insured, as the result of an automobile accident which occurred on August 7, 1954. This tort suit was instituted as a direct action against the Audubon Insurance Company under the provisions of LSA-R.S. 22:655.
The defendant filed an exception of no right or cause of action based upon the failure of its insured to give notice of the collision in accordance with one of the conditions set forth in the contract of insurance, as follows:
“1. Notice of Accident — Coverages A, B and C: When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.”
It is true that no notice was given by the insured to the defendant and its first knowledge of this claim was the filing of the suit, which was approximately eight months after the accident. It is agreed and admitted that there was no collusion or fraud involved on the part of either party. The insured testified that he did not feel that any notice was necessary because Dr. Lipscomb, to whom the plaintiff’s minor daughter was taken for treatment immediately after the accident, indicated that the latter’s injuries were of a minor nature. There is no testimony whatsoever as to whether the plaintiff or his daughter knew that Mr. St. Germaine, the insured, had insurance prior to the time they visited their attorney, approximately eight months after the accident.
The liability of the defendant insurance company is not questioned. Medical bills of the plaintiff and injuries to his minor daughter arose as a result of the negligent operation of the car by the minor daughter of the insured.
The Lower Court overruled the defendant’s exception under authority of a majority holding of our Supreme Court in the case of West v. Monroe Bakery, 217 La. 189, 46 So.2d 122. The holding in this case is still the law, that the insurer cannot escape liability under its policy contract because of the failure of its insured to give notice as soon as practicable after the accident has occurred and that where an injured third person is not at fault, he does not lose his right or cause of action for *531 the breaching of an agreement by the insured with its insurer. There is nothing factually shown in the record of the case at bar which would deprive the plaintiff and/or his daughter of their cause or right of action against the defendant company. The judgment of the lower court in overruling the exception of no cause or right of action is affirmed.
The case was duly tried and judgment rendered in favor of the plaintiff, Sandra Kimball Chase, for $150 and rejecting the demands of plaintiff Louis Kimball and Brandon Chase for medical expenses paid by the former prior to the marriage of Sandra Kimball and by the latter after their marriage, as the court found no causal connection between the accident and plaintiff’s back injury and resulting disability. All plaintiffs appealed and defendant has answered the appeal asking that its exception of no cause or action be sustained and, in the alternative, that plaintiff’s suit be dismissed in its entirety.
The only remaining questions are whether the plaintiff is entitled to recover the medical bills paid by him prior to the marriage of his daughter on Nov. 26, 1955 to Brandon L. Chase, and thereafter whether the latter is entitled to recover the medical bills paid by him on behalf of his wife, and the amount to be awarded Mrs. Sandra Kimball Chase for her personal injuries, as she was substituted the plaintiff in the supplemental and amended petition filed on February 11, 1957, the date the case was tried. In this supplemental petition there was also a prayer for recovery under the provisions of LSA-R.S. 22:658 for 12% penalty in case of failure to timely pay medical expenses and reasonable attorney fees in the amount of % of the medical expenses. Without further ado we hold that there is no justification under the facts of this case for the imposition of the penalties.
On the date of the accident Miss Carolyn St. Germaine, 19 year old daughter of the insured, and Caroline Adams and Sandra Kimball Chase, plaintiff herein, were returning home from a school picnic at Pon-chatoula Beach. Carolyn St. Germaine was driving her father’s car with Caroline Adams on the front seat beside her, and Sandra Kimbal Chase was sitting to the right of the rear seat. Caroline Adams lived approximately five or six miles west of the Town of Ponchatoula on the Springfield Highway and to its north, and it was the intention of Carolyn St. Germaine to take her home first. It appears that she forgot the location of the road which turned to the Adams home and it was called to her attention at a time when, in fact, it was too late for her to successfully make this right angle turn at the speed at which she was going at the time, however, she attempted to make this turn and as a result lost control of her car which hit a stop sign and demolished it, went into a ditch and on across and struck the corner of a fence knocking it down. When she made the sudden turn to the right it threw Sandra Kimball Chase across the back seat to the left where she stated she hit the arm rest and her shoulder hit the bottom of the window and her head hit the metal bar at the top of the window rendering her unconscious.
Caroline Adams’ version of what happened or what she saw immediately after the car came to rest as to the position and condition of plaintiff Sandra Kimball Chase, is accurately revealed in her testimony as follows:
“To the best of my knowledge I remember looking around and I was still kind of —you know — -it happened so sudden, and Carolyn St. Germain had just glimpsed in the back and she went into shock, she was sort of screaming and bearing against the steering wheel and I looked into the back and I saw Sandra, I think she was kind of half way — maybe she was lying or half way leaning, something like that — anyhow it scared me because her neck was kind of turned and I was scared she had broken her neck and she was real pale and Carolyn St. Germain was scream *532 ing, and I tried to get Carolyn back into control of herself, I slapped her, you know, and tried to make her gain control of herself and I got in the back seat and looked at Sandra. I know that I rolled down the window and propped her. feet up and I remember — I don’t remember the order of it —but I remember feeling her neck, she was unconscious, to see if it was broken or anything like that and then I laid her down and propped her feet up out the window because her face was awfully pale and then the boys came back and we discussed it, we didn’t exactly know what to do and Carolyn had gained some control of herself and they took Carolyn St. Ger-main and put her in the other car and we lifted Sandra very gently out of the car and laid her on the grass and then we decided to take her to the clinic in Poncha-toula and we very carefully lifted her and put her in the other car and the five of us, the two boys and three girls, went to Ponchatoula. She was still kind of unconscious.”
Immediately after the accident Sandra Kimball was taken to Dr. Lipscomb’s clinic where she remained for some three hours or until she regained consciousness. Dr. Lipscomb told Sandra that he did not think she was seriously hurt and that she could go home and return again in a “couple of days.” Sandra’s main complaint after the accident and in this suit was of a bade injury. She went back to Dr. Lipscomb several times and about a month or two months after the accident she changed doctors and went to see Dr. Scarborough of Ponchatoula.
On the trial of the case it was agreed between counsel for plaintiff and defendant that the medical reports of Dr. Scarborough,'Dr. Dowell of Baton Rouge dated May 10, 1955, June 3, 1955, September 23, 1955, November 7, 1955 and the X-ray report by Doctors Robert and Geheber dated May 10, 1955, and the report by Dr. Dean Echols of Ochsner Clinic in New Orleans, Louisiana, dated January 19, 1956, and the report of Dr. Dean Echols, Ochsner Clinic, New Orleans, dated January 3, 1957, were filed in evidence rather than taking the testimony of these doctors. In view of this stipulation it is as if the doctors had been present and testified insofar as the litigants are concerned and there is no presumption for or against either party because they were not actually produced on the trial of the case.
Dr. Lipscomb was the only doctor who did not testify or file a report which was accepted in lieu of his testimony. The record shows that Sandra Kimball was under his treatment or made visits to his office for a period of a month approximately from the date of the accident. Her main complaints were with regard to her back during that period and according to her testimony Dr. Lipscomb only examined her. In view of the fact that Dr. Scarborough gave the same physical examination and could find nothing from such an examination that would account for the pain and disability in her back and it was only upon the taking of an x-ray and examination by experts that a basis for the complaints could be found, the absence of Dr. Lipscomb’s testimony or a report from him neither adds to nor detracts from the testimony of Sandra Kimball.
Dr. Scarborough’s report, given under date of April 4, 1955, states that Miss Sandra Kimball was seen by him in September 1954 with complaints of low back pain, weakness and inability to sleep well. “She stated that her symptoms began following an automobile accident one month previously. Following this accident she was taken to another physician for treatment and states she was told she had received a mild concussion of the brain.”
Dr. Scarborough’s report further states:
“Since September of 1954 she has been seen by me on frequent occasions with these same complaints. Physical examination has failed to reveal any organic pathology to explain these complaints, however, radiographic studies have not been done.”
*533 Much is made of the fact that Sandra Kimball continued to play basketball on the Ponchatoula School team. The record shows that she went to Dr. Scarborough and he strapped her back whenever she played basketball. The record further shows that she never had any accident or injury to her back previous to the automobile accident of August 7, 1954 which is the basis of her claim for personal injuries in this suit. The testimony of Dr. Feder which will be later discussed was to the effect that Sandra Kimball really should not have been playing basketball or participating in such activities, however, she was under the treatment of a doctor who knew of her complaints and who was strapping her back on each occasion that she attempted to play basketball, and if Dr. Feder was correct then the doctor under whom she was being treated should have told Sandra Kimball not to participate in basketball. The record shows that Sandra Kimball was active in school affairs and also ambitious for she obtained a certificate from the Alsia C. Hyde Dance Studio on April 13, 1950 showing that she had successfully completed the prescribed course in tap dancing, and on April 24, 1952 she received a teacher’s certificate from this same school for “Tap”, and on April 24, 1952 she also received a certificate from this same school which stated that she was worthy of and entitled to full confidence as a teacher of the technique of ballet dancing. The fact that Sandra Kimball attempted to play basketball does not alter the fact that during this time she was constantly under the treatment of a doctor for her back and whether this activity actually contributed to or aggravated the injury to her back received in the automobile accident is not positively revealed by this record. It would not affect her right to recover unless it was shown that she had been forbidden by the doctor or advised that such an activity would contribute to her disability.
Sandra Kimball’s.back continued-to give her trouble and in April of 1955 she went to see her attorney and he advised her to see Dr. Feder. Sandra testified that at the time she visited her attorney she had not seen Dr. Scarborough for approximately a month.
Dr. Feder testified at length in the case but his reports are also introduced and they are in accord generally with his testimony and will be used as they are compact. On April 9, 1955 Sandra Kimball was examined by Dr. Feder. This report states in part:
“Back and Lumbar region: There is a definite hardening of the para-vertebral muscles on the left with the paravertebral muscular spasm more pronounced about the lumbosacral joint. Moderate palpation produces spasm and muscle tenseness over area with contraction of left gluteal muscle and production of subjective pain. Tenderness is over entire lumbosacral joint but extends laterailly to left mostly. There is tenderness over the left sciatic notch. Anteflexion is accomplished without difficulty to about 120 degrees and after that patient has pain. She is unable to touch her toes with her fingertips due to pain and at that angle placed both of her hands on her knees, for support. Hyperflexion produced pain and lateral bending to the right produces muscular spasm and pain of an involuntary nature. Lateral bending to the left also produces some discomfort but patient can accomplish without complaining. The straight leg raising test is positive on the left. There is no pain with the straight leg raising test on the right. There is an area of anesthesia or numbness of sensation over lateral left thigh and lateral calf of leg. Ankle jerk seems diminished on left. Jugular compression and coughing causes sharp pain in lower back with radiation down the sciatic nerve. There is no leg shortening nor muscular atrophy. There is no pelvic tilt. Flexing leg on abdomen and then on thigh produces pain in lower left back region and down the left *534 leg. There is no such reaction on the right.
“Impression and Discussion: The fact that this young lady was rendered unconscious at the time of the accident and has had the usual traumatic brain syndrome caused by a concussion; and due to the fact that these symptoms have not completely disappeared by now is indicative that she suffered not a mild concussion, but a severe concussion. I would base that, not so much on the fact that she was unconscious for hours and semi-conscious or dazed for days, not so much on this fact, but the fact that she is showing post traumatic brain symptoms indicative of a rather moderately severe brain contusion as well. I cannot explain her lapse of memory on the mere assumptive basis above; together with other subjective phenomena there are or may be indicative of some deeper intracranial injury. But no objective findings are found at this time to bear this out. This is not unusual in these conditions in either case outlined. Certainly her condition will bear watching. I have checked her for a subdural clot or hemorrhage and cannot at this time find clinical evidence of such a condition. But of times, and I might say, most times, this is the case.
“As far as her back is concerned, she certainly does show a persistent backache with attempts at medical advice and treatment over a period of 8 months with a radiculities, muscular pain and spasm, and areas of anaes-thesia below the knee. These are certainly indicative of a possible injury to the SL-S disk. It just appears that this condition is more than a severe sprained back with severe myofascites or torn or pulled muscles and ligaments. I am of the opinion that this patient should be referred for orthopedic consultation and also it might be well for neurologist to check the symptoms referred to the nervous system. This girl is disabled in my opinion and her prognosis is dependent on the findings as time progresses. We will treat her conservatively until we decide just what is to be done for her.
“X-ray examination of lower spine is negative for fracture. If it is your desire to have her sent for consultation, we will be glad to arrange for an examination with either Drs. Bannerman, Dowell, or Sebatier in Baton Rouge.
“Final Diagnosis:
1. — Brain concussion, moderately severe, with possible contusion and post traumatic syndrome.
2. — Severe lumbosacral strain with muscle and ligament tear vs. Acute herniated intervertebral disk. The latter is most probable and possible in this case.
“Yours truly,
“s/d A. J. Feder, M. D.
“April 15, 1955
“Progress notes on case during the past 6 days — (April 9, 15, 55)
“We have watched this patient every day and we feel more strongly that this girl should be sent for consultation. We have been treating her with sedatives for her nerves, analgesics and mephenesin, local diathermy, local injection and sleeping on a hard surface. She has shown no improvement in this short time and still complains of the pain and still has the paravertebral spasm.
“A. J. Feder, M. D.”
On September 6, 1955 Dr. Feder gave another report which reads in part as follows :
“During the time of treatment she has remained closely under our observation and we have tried to adhere to the recommendations of our orthopedic consultant, Dr. J. W. Dowell of Baton Rouge. Like Dr. Dowell, we *535 ielt that this young lady had incurred a severly traumatized back and had many of the symptoms of a ruptured intervertebral discé including a narrowing of the intervertebral interspace mostly on the left. We also felt that she had incurred some residual as a result of a concussion with unconsciousness. We based the latter on her symptomatology and history together with the information and complaints from the young ladies parents. We felt at that time that she had a post traumatic concussive syndrome and suggested observation to rule out some possible residual intracranial damage which had not been picked up or detected heretofore. We treated this latter condition with medication, rest and an attempt to generally build up this girl’s nervous system. I, as well as Dr. Dowell, felt that although there was a definite possibility of a herniated intervertebral disk in this case, that surgery was not indicated due to her age. These cases have a tendency to resolve themselves with conservative treatment consisting of heat, diathermy, local injection, antispasmotics, controlled exercises, and traction. We have used them all in this case. At suggestion of Dr. Dowell we sent her for corrective exercises to a physiotherapist in Baton Rouge, but had to discontinue this treatment after a few times due to the aggravation of her pain and spasm due to these exercises.
“During the past months, she has shown some tendency towards improvement, but has still returned on occasions with marked pain and interverte-bral muscular spasm and limitation of motion. At present she still has some limitation of motion and pain on palpation. On the last measurement, the left thigh measured one inch less than the right, whereas it was only one half inch less about three months previously. She still has some nerve root irritation symptoms and radiation, but in all she has shown some improvement and she states that she feels that she is better but not well. Her mental condition has, in my opinion, also improved. I am convinced that there is no intra-cranial residual inform of serious pathology. Her parents have given us the information that the girl has ‘blacked out’ once since our treatment and is still irritable and nervous and still has headaches. She states that she feels that ‘whatever was wrong with her head’ has improved in the past months. We are inclined to feel that the post traumatic syndrome has improved and will improve with time.
“As far as her injured back is concerned, she is not well yet and we do not know how long it will be until she is completely well, or if she will be left with a residual. We do know that she is not without symptoms or objective findings at present. We will continue along the lines of treatment in the past.”
Again on November 17, 1955 Dr. Feder rendered another report which is in part as follows:
“As per your request, we are herewith furnishing our up to date report in the above injured individual. As you know she has been under our supervision and treatment continuously since April 12, 1955, and during the past seven months, we have tried to adhere to the treatment as suggested by the orthopedic consultant. We have given her diathermy treatments daily for two weeks at first, then three times a week for about 8 weeks, and since July 5th, we have given her treatments about twice a week — -averaging eight or nine treatments a month. We have supplemented this with local injection at first, mephenisin and dioloxal and exercises. We tried traction, but this as well as exercises aggravated her condition. As advised in the last re *536 port by Dr. Dowell, we can only continue with the treatment in the past as suggested by him.”
Again on March 7, 1956 Dr. Feder rendered another report which reads in part as follows:
“Since this girl’s marriage, she has had many duties to perform as a housewife such as routine housework, climbing stairs, and other wifely duties that have placed added strain to her injury. For this reason we thought it best to send her to the Ochsner Clinic for opinion and consultation. You have Dr. Dean H. Echols, head of the department of Neurology of the Ochsner Foundation Clinic, by now. You will note that in essence his report is almost identical with the original impression and diagnosis which I presented in my original report to you. In essential overall picture, it concurs also with the consultant orthopedist, Dr. J. W. Dowell of Baton Rouge to whom I sent the patient and who examined the patient on more than one occasion.”
Sandra Kimball was examined by Dr. Willard Dowell of Baton Rouge, and on May 10, 1955 rendered a report in which he stated that upon examination he found some tenderness over the left sacroiliac joint and over the greater sciatic notch on the left. The report further stated and we quote:
“X-rays of the lumbosacral spine were taken at the office of Drs. Robert and Geheber, I am enclosing a copy of this report for your records. X-rays showed no evidence of fracture or dislocation. They did show slight narrowing of the lumbosacral disc space, and a slight left lateral scoliosis. There was no loss of the normal lor-dotic curve.
“This patient has slight narrowing of the lumbosacral disc space which is a little unusual finding in a patient of this age. Considering her history and physical findings, I am of the opinion that she incurred a lumbosacral sprain. Although she has some symptoms suggestive of a herniated intervertebral disc, I do not feel that there is evidence at hand to indicate a herniated inter-vertebral disc. I would suggest continuing conservative treatment. I feel that a flexion type of low back exercises would be of value to this patient, and would be glad to make arrangements for her to receive instructions in these exercises from a physio-therapist in Baton Rouge. I would suggest reexamination on this patient in approximately 60 days. I do not feel that a myelogram is indicated at the present time.”
On June 3, 1955 Dr. Willard Dowell ren dered another report in which he stated
“The patient was re-examined on June 2, 1955. She says that she has had recurrent pain in her back since the time of my last examination. She states that the pain is brought about by practically any type of exercise. It apparently clears up fairly well with heat and conservative treatment. She describes the pain as radiating down the left leg. The pain is not aggravated by coughing or sneezing at this time.
“Examination reveals that the patient has a good posture. There is some tenderness to the left of the lum-bosacral joint and over the paraverte-bral muscles at that level. There is also some tenderness over the great sciatic notch on the left. There was slight muscle spasm present on the left side. There was some limitation of active lumbar flexion with flexion being limited to 60 degrees. The patient states that further flexion of her back is painful. There is no restriction of straight leg raising on the right side with no complaints from the patient on carrying out this test. She did complain of some pain on the left side *537 with straight leg raising being restricted to 105 degrees. There was an area of decreased skin sensation over the lateral aspect of the left calf and the left thigh. Tendon reflexes of the legs were active and physiological. The calves were of equal circumference. The left thigh measured J4 to V2" less in circumference than the right at a point 7" and 9" above the patella.
“No additional X-rays were taken as it was felt that the previous X-rays were adequate. These X-rays had showed a light narrowing of the lum-brosacral disc space, a little more noticeable on the left than on the right side.
“This patient’s back does not seem to be in as good a condition at the time of this examination as at the time of the previous examination, apparently due to the fact that she had been doing some exercising prior to this examination. She did show some limitation of back motion, and better localization of tenderness over the lower back. I feel that this patient may have a herniated intervertebral disc, but do not believe that the nerve root pressure is severe enough to indicate anything other than conservative treatment. I do feel that this patient would benefit appreciably from flexion type of exercises, and would like to suggest that arrangements be made for the physical therapist here to instruct her in this type of exercise. I feel that it would be well for her to eliminate such activities such as swimming which apparently aggravates her back condition. I would suggest re-evaluation of this patient in approximately 60 days.”
Again on September 23, 1955 Dr. Dow-ell submitted another report in which he stated:
“Thank you for referring Miss Sandra Kimball to me for re-examination and evaluation. Reference is made to my letters of May 10, 1955 and June 3, 1955, As you will recall, I was of the opinion at the time of my original examination that this patient had incurred a lumbosacral sprain. It was my impression at the time of the second examination that she did have a lum-bosacral sprain, and that she may have a herniated intervertebral disc, although I did not feel that nerve root pressure was severe enough to indicate anything other than conservative treatment. I recommended flexion type of exercises at the time. Miss Kimball tells me that the exercises which were taken under the direction of Miss Stagni, a physio-therapist here in Baton Rouge, aggravated her back pain, and she discontinued them after discussing this with you. When examined on September 22, 1955, she felt that she had made some improvement. She had a case of influenza the week prior to my examination, and she felt that the coughing associated with the influenza had aggravated her back condition. She was still complaining of some low back pain with radiation of pain to her left leg. She says that when she arises in the morning she has very little back or leg discomfort, but that this pain appears whenever she exercises or is on her feet for long periods of time.
“On examination there was noted some tenderness to the left of the lum-bosacral joint and the paravertebral muscles at that level. There was slight muscle tightness present on the left side with the patient in a standing position, athough this could be relaxed by shifting her position. There was an improvement in range of lumbar flexion, this being limited now to 80 degrees. There was very little limitation of extension of the spine. There was no restriction of straight leg raising on the right with the patient complaining of some discomfort on straight leg raising on the left and about 10 degrees restriction of that *538 motion being present. There was noted once again an area of decreased skin sensation over the lateral aspect of the left calf. Tendon reflexes of the legs were active and physiological. The calves were of equal circumference. The left thigh measured a little more than 1/2 inch less in circumference than the right thigh at a point 8 inches above the patella.
“Previous x-rays which had been taken at the office of Drs. Robert and Geheber showed a slight narrowing of the lumbosacral disc space.
“It is my opinion that this patient has shown some improvement since the time of my last examination. I would still recommend continuation of a conservative treatment consisting of heat and restriction of activities, such as exercises. I feel that the patient has a small partial disability at the present time.”
On November 7, 1955 Dr. Dowell rendered a final report a portion of which reads as follows:
“I do not feel that this patient has shown much change since the time of my last examination. There is still present some tenderness over the par-avertebral muscles on the left side, and some evidence of muscle tightness. It is my opinion that this patient does have a partial disability at this time which I would estimate as between 5 and 10 per cent on the basis of the body as a whole. I recommend that she continue with the same line of treatment as has been followed for the past few months.”
Also in the record is the report from Dr. Dean Echols of date January 19, 1956. This report in part reads as follows:
“ * * * However, bending caused her to complain of left-sided back pain. Side bending was also somewhat painful. With the patient supine the straight leg raising test on the left was painful at forty-five degrees above the horizontal. This pain was in the left side of the back and down the thigh-almost to the knee. The straight leg-raising test was completely negative on the right side. Sensibility to light touch and pin point was diminished! over the entire left lower extremity.
“It is my impression that this patient sustained a concussion of the brain and' possibly some contusions of the brain-in the accident of August 7, 1954. However, it is my impression that she-has made a recovery from this brairn injury.
“In addition, the patient sustained an-injury of the back in the same accident, from which she has not yet fully recovered. Her chief complaint ever-since the accident has been left sided-low back pain and numbness and discomfort in the left lower extremity. These symptoms are somewhat suggestive of partial rupture of one of the-lower lumbar intervertebral discs, but other types of lower back injury could! give these symptoms. I do not attribute -the questionable atrophy of the-left thigh nor the diminished sensibility of the left lower extremity to the injury of August 7, 1954. I am unable-to make a definite diagnosis, and consequently' advise against myelography.. If she does have a ruptured interverte-bral disc, surgery is not justified at this time. If she does have a ruptured disc there is a good chance for spontaneous recovery with the passage of additional time.”
Again on January 3, 1957 Dr. Dean H„ Echols rendered another report in which he stated:
“Dear Dr. Feder:
“Mrs. Brandon Chase, age eighteen, returned to see me on 12-31-56. She said that she was miserable with left sided back pain and left sided sciatica during the month or two preceding the birth of her first child on 9-23-56. *539 She said that she was forced to spend most of the last month of the pregnancy in bed. Following delivery she was relieved of the sciatica and partially relieved of the back pain.
“Prior to the delivery the sciatica extended down the extremity to the toes.
“The patient is really not having too much discomfort at the present time hut she is annoyed that she is not 100% well. She is forced to be careful about bending forward because a catch develops in the lower back and she finds it difficult to resume the erect position again. She is forced to employ a servant more days per week than she would if she were free of back pain. Mrs. Chase admits that she is having less back trouble at the present time than she was having one year ago.
“I did not make a complete examination. Both ankle jerks were depressed but equal on the two sides. She was able to flex very well at the waist but while doing so she complained of a palling sensation in the left side of the lower back. Also, she experienced some increased discomfort on regaining the erect position.
“I still suspect that this lady has a ruptured lower lumbar intervertebral disc but she is not having enough trouble at the present time to justify myelography or surgery. Her next pregnancy may or may not be complicated by a return of the disabling sciatica.”
“Cordially,
“Dean H. Echols, M.D.”
In addition to these reports we also have in the record a report from Dr. A. G. Roberts of Baton Rouge, Louisiana, as a result of an x-ray which was dated May 5, 1955 for Dr. Dowell and states “Examination: Low Back Study.” In this report Dr. Roberts states: “From the standard roentgenograms, however, I do not believe that an extruded disc can be definitely excluded and if clinically indicated, further investigation by means of an opaque myelo-gram might be advisable * * * Summary: apparent-slight narrowing, lumbo-sacral intervertebral space, a little more pronounced on the left than on the right side; no associated reactive bone changes are present and the observation is regarded as of uncertain clinical significance * * * ”.
These reports or testimony of the doctors have been quoted somewhat in detail in view of the fact that the lower court felt that the record failed to reveal a causal connection between the disability which these doctors without the least doubt found to exist in the back of Sandra Kim-ball and the automobile accident of August 7, 1954. The District Court’s belief was founded on the fact that this young lady continued to play basketball however, the record clearly shows that she did it in pain and that she had to have her back strapped by Dr. Scarborough each time, and also that her condition became worse so that she changed to Dr. Scarborough whose reports speaks for itself. She still complained of back pain while being treated by him. Dr. Feder’s reports show without any doubt that her condition was worse and her complaints were genuine. The Lower Court also felt that in view of the testimony that she had gone hunting with her father on Natalbany river was evidence that her back was either not so very painful or at that time not injured. As stated previously this young lady attempted to carry on her normal activities although in pain. What kind of hunting she did or whether it was strenuous or not is not shown in the record. The subject was not pursued by counsel. In addition, during this period she made trips to New Orleans to a modeling school and also participated on a radio program as a model. She testified that during all this time she still suffered with her back and the record shows that she was under constant medical attention from the time of the injury on August 7, 1954 up to the date of the trial, *540 and the last reports of the doctors show that she was still partially disabled. As to the television shows, the record shows that the program is on the air for half an hour but that she participated “just a few seconds,” so that really the only strenuous activity which is shown by the record was playing basketball, and whether she completed the season is not shown by the record. It does show, though, that she was attempting to play with pain because Dr. Scarborough was treating her at this time and personally strapped her back on each occasion. It is also suggested that Sandra Kimball should have produced her father and mother to testify. Their testimony would have been corroborative but could also have been subject to a charge of interest. Such testimony would have been cumulative only as there is no dispute in this record with regard to the facts. In addition, the fact that her father, one of the plaintiffs herein, paid approximately $2,000 worth of doctor bills and did not wait for the outcome of the law suit is silent but eloquent proof that he believed his daughter was suffering and needed medical attention. It is also, suggested that the opinion of the doctors in this case was based upon history given them by Sandra Kimball and her mother. This is true but there is nothing in the record that would lead one to disbelieve the history which the doctors state in their reports as being given them and upon which they based their findings. Unless such history is shown to be false or untrue it must be accepted.
From the record we are firm in our opinion that plaintiff, Sandra Kimball Chase, suffered an injury to her back, either in the nature of a sprain or more likely an intervertebral disc injury in the automobile accident of August 7, 1954, and that her disability as described by the doctors was due to the accident. It also follows that plaintiff, Louis Kimball, is entitled to a judgment for medical expenses paid by him on behalf of his daughter prior to her marriage and that plaintiff, Brandon Chase, is entitled to a judgment for the amount of medical expenses expended by him on behalf of his wife after their marriage.
We believe that an award of $3,-500 to Mrs. Sandra Kimball Chase for her pain, suffering and disability under the special facts of this case would be proper.
The plaintiff, Louis Kimball, is entitled to a judgment for the amount paid on behalf of his daughter, Sandra, prior to her marriage and which is practically undisputed and proven to be the sum of $1,-054.
The plaintiff, Brandon Chase, husband of Sandra Kimball Chase, is entitled to a judgment for the amount of medical expenses paid by him on behalf of his wife after their marriage, which is shown to be $189.
It is therefore ordered, adjudged and decreed that the judgment of the District Court in favor of Sandra Kimball Chase be amended and increased to the sum of $3,500, together with legal interest from judicial demand until- paid and all costs of suit.
It is further ordered, adjudged and decreed that the judgment of the District Court denying the demands of the plaintiff Louis F. Kimball for medical expenses paid prior to the marriage of his daughter, Sandra Kimball, be reversed and it is now ordered, adjudged and decreed that there be judgment in favor of Louis Kimball and against the Audubon Insurance Company, defendant, in the full sum of $1,054, together with legal interest from judicial demand until paid and all costs of suit.
It is further ordered, adjudged and decreed that there be judgment in favor of Brandon Chase and against the defendant, Audubon Insurance Company, in the full sum of $189, together with legal interest from judicial demand until paid and all costs of suit.
Judgment amended and affirmed in part and reversed in part and rendered.